USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___8/6/2018___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

HOLLY ANN DE RAFFELE,       :
      :
      Plaintiff,       :       **OPINION AND ORDER**
      :
      -against-       :       17-CV-3243 (JLC)
      :
NANCY A. BERRYHILL, Acting       :
Commissioner, Social Security       :
Administration,       :
      :
      Defendant.       :

---------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

    *Pro se* plaintiff Holly Ann De Raffele seeks judicial review of a final decision by defendant Nancy A. Berryhill, the Acting Commissioner of the Social Security Administration (the "Commissioner"), denying De Raffele's claim for Disability Insurance Benefits ("DIB") under the Social Security Act. The Commissioner has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. In response to the Commissioner's motion, De Raffele has submitted an opposition that the Court construes as a cross-motion for judgment on the pleadings. For the reasons set forth below, the Commissioner's motion is denied, De Raffele's cross-motion is granted, and the case is remanded to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

# I. BACKGROUND

## A. Procedural History

De Raffele applied for DIB on April 18, 2014. Administrative Record ("AR") dated July 6, 2017, Dkt. No. 10, at 134-35. The Social Security Administration ("SSA") denied De Raffele's DIB application on June 13, 2014. *Id.* at 75-80.[1] On June 24, 2014, De Raffele requested a hearing to challenge the denial of her DIB application. *Id.* at 87-88. Represented by counsel, De Raffele appeared before Administrative Law Judge Michael Stacchini (the "ALJ") on January 21, 2016 in White Plains. *Id.* at 36. The ALJ found that De Raffele was not disabled and denied her DIB application in a decision dated February 10, 2016. *Id.* at 30. On April 14, 2016, De Raffele requested a review of the ALJ's decision by the Appeals Council. *Id.* at 8-10. On February 27, 2017, the Appeals Council denied De Raffele's request, making the ALJ's decision final. *Id.* at 11-15.

De Raffele, proceeding *pro se*, timely filed this action on May 1, 2017, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g) and 1383(c)(3). Complaint ("Compl."), Dkt. No. 2. The Commissioner answered and filed the Administrative Record on September 25, 2017. The parties consented to my jurisdiction for all purposes under 28 U.S.C. § 636(c) on October 18, 2017. Dkt.

---

[1] On April 25, 2014, De Raffele had also applied for Supplemental Security Income ("SSI") under the Social Security Act. AR at 136-40. However, the administrative record contains no information regarding the outcome of De Raffele's SSI application. Nor do the parties discuss the SSI application in their submissions. As such, this Opinion and Order focuses only on the denial of De Raffele's DIB application.

No. 12.  On November 27, 2017, the Commissioner moved for judgment on the

pleadings and filed a memorandum in support of her motion ("Def. Mem.").  Dkt.

Nos. 13-14.  De Raffele filed a letter in opposition to the Commissioner's motion on

January 22, 2018 ("Pl. Opp."), Dkt. No. 17.  As mentioned, the Court liberally

construes De Raffele's opposition letter as a cross-motion for judgment on the

pleadings seeking a remand of the ALJ's decision.  Neither party filed reply papers.

## B.     The Administrative Record

### 1.     De Raffele's Background

De Raffele, born in 1974, was 37 years old on the alleged disability onset date

of May 5, 2012.  AR at 63.  A high school graduate, she had worked as a waitress for

20 years until she began suffering from both vertigo and mononucleosis in May

2012, which caused her to stop working.  *Id.* at 51, 162.  De Raffele claimed that she

also suffered from chronic Epstein-Barr virus (EBV), hypothyroidism, fatigue, and

migraine headaches.  *Id.* at 8, 46-48.  She had been diagnosed with fibromyalgia

when she was 20 years old, and it had gotten "progressively worse over the years."

*Id.* at 46.  She previously had a pectus deformity in her chest, which had been

surgically repaired.  *Id.* at 290, 308-09.

According to her testimony at the ALJ hearing, since 2012, De Raffele has

lived at home in New Rochelle with her parents, who were approximately 79 and 77

in 2016.  *Id.* at 41, 52.  At that time, De Raffele could not cook or straighten up.  *Id.*

at 41.  She did not go shopping or do laundry at all.  *Id.* at 41-42.  She drove "[v]ery

rarely" in the neighborhood.  *Id.* at 41.  De Raffele would occasionally become

"bedridden" when experiencing "a bad flareup." *Id.* at 42, 45. However, De Raffele was never hospitalized for such episodes. *Id.* at 47. She also had not gone to the emergency room. *Id.* at 46.

De Raffele had belonged to a gym, and, prior to her illness, she would go to the gym six times a week. *Id.* at 292. She stopped regularly going to the gym "a while" before the ALJ hearing in 2016. *Id.* at 43. De Raffele still tried to walk in the gym when she could. *Id.* She visited her friends "a couple times a year." *Id.* at 43-44. De Raffele denied having any issue with maintaining relationships or "getting along" with other people. *Id.* at 44. But she could not join her family for any activities, except when they came to visit her. *Id.* at 48.

On a typical day since May 2012, De Raffele would take a shower, eat, and watch TV. *Id.* at 42. De Raffele could only watch TV "sometimes." *Id.* at 50. She could not read or use a computer, the latter requiring "too much motion." *Id.* De Raffele spent "[m]ost of the day" lying in bed. *Id.* at 44, 50. Her sister moved into a house next door and helped De Raffele with "anything" she needed. *Id.* at 49-50.

## 2. Relevant Medical Evidence in the Record

### a. Treatment by Dr. Paul Gittelman

Dr. Gittelman, an otolaryngologist (also known as an ear, nose, and throat doctor), examined De Raffele on numerous occasions in 2012 and 2013. In treatment records covering the period of January 22, 2012 to October 23, 2013, Dr. Gittelman described De Raffele's general appearance, strength, and mood as "normal." *Id.* at 263-64, 267-70. Dr. Gittelman found De Raffele also had intact

cranial nerve and normal motor-sensory function. *Id.* at 263-64. Her voice was consistently evaluated as "normal." *Id.* at 263, 267, 269-70. De Raffele received a result of "pass" for both ears as part of an audiogram test performed on January 11, 2013. *Id.* at 265-66. In a report dated April 19, 2013, Dr. Gittelman diagnosed De Raffle with chronic rhinitis, nasal mass and obstruction, and found that she had a deviated septum, clear and copious mucous, edematous mucosa, and no polyps. *Id.* at 268. Following a visit on August 29, 2013, Dr. Gittelman diagnosed De Raffele with vertigo. *Id.* at 269.

### b. Treatment by Dr. Matthew Kates

On May 14, 2012, Dr. Kates, also an otolaryngologist, performed physical, ear, nasal, throat, neurological, eye, oral, head, face, and neck exams on De Raffele and concluded that results were normal. *Id.* at 365-66. He diagnosed De Raffele with "cough" and "chronic nasopharyngitis" (cold). *Id.* at 367. After a visit on July 18, 2012, during which De Raffele complained of ear aches and dizziness, Dr. Kates performed a physical exam and results were normal. *Id.* at 361-63. Blood tests ordered by Dr. Kates revealed that De Raffele tested positive for EBV. *Id.* at 381-84. More than one year later, on December 5, 2013, Dr. Kates performed another physical exam of De Raffele and concluded that results were normal. *Id.* at 356-59. He diagnosed De Raffele with benign paroxysmal positional vertigo ("BPPV") and disequilibrium and recommended Brandt-Daroff exercises (which help ease vertigo symptoms). *Id.* at 359. In a visit on December 12, 2013, De Raffele reported that she "started to feel worse after doing the at home exercises." *Id.* at 515. Dr. Kates

noted that De Raffele had "[n]o pain anywhere, no unus[u]al neurological symptoms." *Id.* De Raffele's other bodily systems were reviewed as normal. *Id.*

In a visit on February 14, 2014, De Raffele told Dr. Kates that she "feels constantly imbalance[d] and feels like she's always on the verge on falling." *Id.* at 348. She also reported taking evotyhroxine for thyroid problems, and that she was back to doing vestibular balance therapy. *Id.* Dr. Kates diagnosed De Raffele with "non-specific" disequilibrium and recommended exercise, alternative medicine, and acupuncture. *Id.* at 352. On March 19, 2014, Dr. Kates performed an ear exam and concluded results were normal, except that that there was crepitus of the right temporomandibular joint. *Id.* at 344-46. Physical exams demonstrated that De Raffele was tested negative for any "neuro/psychiatric" issue such as "focal weakness, headache, seizures and syncope." *Id.* at 345. De Raffele was tested negative for "fatigue." *Id.* at 344. De Raffele was diagnosed with disequilibrium and benign paroxysmal vertigo, and treated with an Epley Maneuver (another exercise that helps treat vertigo symptoms). *Id.* at 347. In a subsequent visit on December 16, 2015, Dr. Kates diagnosed De Raffele with BPPV and treated her with an Epley Maneuver. *Id.* at 474-75.

On a December 17, 2014 visit, De Raffele presented "[s]inus symptoms (acute)" and ear pain. *Id.* at 501. De Raffele reported that she was "congested and also has a runny nose at times and has sinus pressure and get[s] dizzy sometimes." *Id.* De Raffele also stated that her "[d]izziness had been much better" but that it became worse with an upper respiratory infection. *Id.* She also noted being

"stressed from a bladder irritation from an uncomfortable bike seat." *Id.* Dr. Kates

performed a nasal endoscopy and tympanometry, prescribed Benadryl and tirosint,

and instructed De Raffele to follow up "as needed." *Id.* at 504.

### c. Treatment by Dr. Patrick Maloney

Dr. Maloney, an allergist/immunologist, examined De Raffele and counseled

her on December 10, 2013. *Id.* at 456-59. He noted that De Raffele had reported a

history of fatigue and allergies. *Id.* at 456. De Raffele was diagnosed with fatigue,

lethargy, malaise, weight gain, eye redness, fullness in ears, sneezing, and vertigo,

as well as "headache." *Id.* at 457. Otherwise, the outcome of the physical exam was

normal. *Id.* at 458-59. Dr. Maloney included in his physical exam report mental

evaluations that De Raffele was "oriented to time, place, person, and situation," that

she had "normal insight," "exhibits normal judgment," and that she demonstrated

"appropriate mood and affect." *Id.* at 458.

On December 24, 2013, Dr. Maloney saw De Raffele again. He diagnosed De

Raffele with fatigue, nausea, bilateral tinnitus, headache, and allergic rhinitis. *Id.*

at 460-61. De Raffele's examination results were otherwise negative. *Id.* Dr.

Maloney noted that De Raffele had an elevated EBV, which suggested "possible

reactivation." *Id.* at 462. Dr. Maloney also noted that she did not display any

severe symptom that could result from EBV, such as "fever, lymphadenopathy, liver

or spleen or cell count abnormalities." *Id.*

### d. Treatment by Dr. Timothy Vartanian

Dr. Vartanian, a neurologist, saw De Raffele for a medical visit on January 23, 2014. De Raffele stated that since the middle of 2009 she had been "experience[ing] the onset of 'dizziness' which she describes both as vertigo and light headed." *Id.* at 311. She added that "[t]hese symptoms have persisted since that time although they wax and wane." *Id.* Dr. Vartanian conducted a physical examination of De Raffele and results were normal. *Id.* at 311-12. Dr. Vartanian was uncertain if De Raffele's symptoms "represent acute EBV infection," and he was "struck by her thyroid test results." *Id.* at 312. He referred De Raffele to an endocrinologist for follow up. *Id.* Dr. Vartanian also conducted a general physical exam and a laboratory test of EBV for De Raffele on January 23, 2014. *Id.* at 314-15. Based on these tests, it was unclear whether De Raffele's symptoms represented "acute EBV infection," and he recommended further evaluation of both EBV and the thyroid. *Id.* at 315.

Dr. Vartanian conducted MRI tests on De Raffele's brain, thoracic spine, and cervical spine on January 26, 2014. *Id.* at 328-43. The MRI brain report established that the finding was "not typical" for demyelinating disease. *Id.* at 334. It also indicated the disease could not be "excluded" due to the presence of "T2 hyperintensity . . . along the undersurface of the corpus callosum." *Id.* MRI reports on both the thoracic spine and cervical spine concluded that no evidence of demyelinating disease existed, while degenerative spine disease existed in the mid

cervical spine "without evidence of cord impingement or foraminal narrowing." *Id.* at 341.

### e.    Treatment by Dr. Stephen Klass

Dr. Klass, a neurologist, treated De Raffele on January 9, 2014. *Id.* at 298. She had been referred to Dr. Klass by Dr. Marcelo Laiz (from whom no treatment notes have been obtained), her primary care physician. *Id.* Dr. Klass diagnosed De Raffele with "weakness" and "fatigue." *Id.* As for mental status, Dr. Klass concluded that De Raffele "appeared alert," while being "oriented to person, place, time and situation." *Id.* at 299. Her speech and language capacity was intact, and so were her reflexes and general coordination of the body, including "straight line walking" and "rapid alternating movements." *Id.* at 299-300. Dr. Klass's psychiatric examination result provided that De Raffele was "cooperative," with an "appropriate mood [and] affect." *Id.* at 300. Dr. Klass noted that De Raffele "appears to have a chronic vertigo that has been off and on over many years," but he was uncertain whether De Raffele's vertigo was a form of Meniere's disease. *Id.* He considered De Raffele's condition as "improving." *Id.* He also noted "bright spots" from her brain MRI tests. *Id.* The result of the general physical exam of other body systems was "normal." *Id.* at 298-99.

### f.    Examination by Dr. David Stemerman

On September 5, 2013, De Raffele underwent an MRI brain examination by Dr. Stemerman, a radiologist, to whom De Raffele had been referred by Dr. Gittelman. The lab report of the MRI test found an "[u]nidentified bright object in

the anterior left frontal lobe" that could be "possibly related to chronic history of migraine headaches." *Id.* at 262. The report recommended "follow-up" and further research for clinical correlation, such as neurological evaluation. *Id.*

### g.    Examination by Northern Westchester Hospital

On November 14, 2013, De Raffele underwent Basic Balance Function Testing at Northern Westchester Hospital, to which she had been referred by Dr. Gittelman. The Basic Balance Function Testing, or the vestibular testing, found that De Raffele had a normal sense of equilibrium, a right BPPV evidenced by a delayed brief rotary nystagmus accompanied by mild dizziness, normal ocular motor tasks, and no spontaneous or positional nystagmus. *Id.* at 285-87. Testing also found that De Raffele had "difficulty using vestibular cues in maintaining a postural stance within the normal limits of sway." *Id.* at 285. De Raffele was recommended to continue vestibular rehabilitation therapy. *Id.* at 287.

### h.    Medical Opinions

### i.    Opinion of Dr. Gittelman

On May 19, 2014, Dr. Gittelman completed an opinion form for the Division of Disability Determination of the New York State Office of Temporary and Disability Assistance. *Id.* at 445-49. In the form, he diagnosed De Raffele with headache, vertigo, and rhinitis (irritation of the membrane inside the nose). *Id.* at 445. Her symptoms included headaches, nasal congestion, and "vertigo/dizziness." *Id.* Dr. Gittelman stated that he had referred De Raffele for vestibular therapy and described the "expected duration and prognosis" of De Raffele's symptoms as

"unknown." *Id.* at 446. He noted De Raffele's history of vertigo, ear-pain, and nausea. *Id.* When asked to provide negative findings, Dr. Gittelman mentioned cleaning De Raffele's earwax. *Id.* at 447. He also wrote that "audio testing" was normal, that De Raffele underwent an MRI test on September 5, 2013, as well as vestibular testing for benign paroxysmal positional vertigo (BPPV) on November 14, 2013. *Id.*

Dr. Gittelman described De Raffele's physical activities as being limited "when dizziness occurs." *Id.* at 448. Otherwise, he opined that De Raffele was not subject to any restriction. *Id.* Dr. Gittelman concluded that De Raffele had "no limitation" to "lift and carry," "stand and/or walk," "sit," "push and/or pull," or other activities such as postural, manipulative, and communicative ones. *Id.*

### ii.    Opinion of Dr. Maloney

On May 19, 2014, Dr. Maloney completed a form for the Division of Disability Determination of New York State Office of Temporary and Disability Assistance. Noting that he had treated De Raffele on two occasions, Dr. Maloney diagnosed De Raffele with fatigue and allergic rhinitis. *Id.* at 450. Dr. Maloney stated that he had not prescribed De Raffele any medication. *Id.* at 451. He also noted that he could not provide a medical opinion about De Raffele's ability to perform work-related activities. *Id.* at 454.

### iii.    Consultative Examination by Dr. Julia Kaci

The Division of Disability Determination referred De Raffele to Dr. Kaci, an internist, for an internal medicine examination. Dr. Kaci issued her report on June

2, 2014.  *Id.* at 469-72.  According to the report, De Raffele had a normal general appearance.  *Id.* at 470.  She was in no acute distress, had a normal gait, and could walk without difficulty or help of an assistive device.  *Id.*  She did not need help to take the physical exam or to get on or off the exam table.  *Id.* at 471.  She could also rise from the chair without difficulty.  *Id.*

De Raffele's physical systems were generally normal, including lymph nodes, head, face, eyes, ears, nose, throat, neck, chest and lungs, heart, and abdomen.  *Id.*  Her spine showed "full flexion, extension, lateral flexion bilaterally, and fully rotary movement bilaterally."  *Id.*  Her joints were stable and nontender, showing no redness, heat, swelling or effusion despite 18 "trigger points."  *Id.*  Her grip strength, strength in upper and lower extremities, as well as hand and finger dexterity were also intact.  *Id.* at 472.

Dr. Kaci diagnosed De Raffele with fibromyalgia, chronic fatigue, recurrent EBV, BPPV, and hypothyroidism.  *Id.*  She concluded that De Raffele's overall physical condition was "stable," except that she had a "marked limitation to any heavy physical exertion."  *Id.*  Dr. Kaci also recommended that De Raffele avoid heights due to her BPPV.  *Id.*

### iv.  Consultative Examination by Dr. Melissa Antiaris

Dr. Antiaris, a psychologist, prepared a psychiatric evaluation report for De Raffele on June 2, 2014.  *Id.* at 464.  De Raffele denied having a history of psychiatric treatment.  *Id.*  Dr. Antiaris described De Raffele as "cooperative" and noted that she "related adequately."  *Id.* at 465.  De Raffele dressed appropriately,

12

groomed herself, and made eye contact.  *Id.*  She had normal posture and motor behavior.  *Id.*  Her speech was fluent and clear enough for her to use "expressive and receptive" language.  *Id.*  De Raffele's thinking was coherent and goal-directed with no evidence of hallucination or any other mental issue.  *Id.*  De Raffele reported that her parents cooked, cleaned, and shopped for her, but that she was able to dress, bathe, and groom herself, as well as do her laundry and manage her funds.  *Id.* at 466.

Dr. Antiaris found that De Raffele had an euthymic mood but an "anxious" affect.  *Id.* at 465.  Dr. Antiaris concluded that De Raffele was "moderately limited in her ability to make appropriate decisions and relate adequately with others," and "moderately limited in her ability to appropriately deal with stress."  *Id.* at 466-67.  Dr. Antiaris also found that fatigue was a cause of such limitation.  *Id.* at 467.  Dr. Antiaris found further that De Raffele was not limited in following and understanding simple instructions or independently performing simple tasks because her attention and concentration were intact.  *Id.* at 466.  She could also maintain attention for the purpose of maintaining a regular schedule.  *Id.*  De Raffele was not limited in learning new tasks and independently performing complex tasks, because her recent and remote memory were intact, her cognitive functioning was average, and her judgment and insight were fair.  *Id.*

Dr. Antiaris concluded that while the results of the examination "appear to be consistent with stress-related concerns," any difficulties did "not appear to be significant enough to interfere with [De Raffele's] ability to function on a daily

13

basis." *Id.* at 467. Dr. Antiaris also concluded that De Raffele's overall psychological prognosis was "fair," while recommending that she engage in psychological treatment. *Id.*

### v. Opinions of Dr. C. Anderson and Dr. R. Liranzo

In June 2014, based on a review of De Raffele's medical records, Dr. Anderson and Dr. Liranzo provided their respective opinions about De Raffele's condition in a Disability Determination Explanation form. *Id.* at 63-72. With regard to De Raffele's medically determinable impairments, Dr. Anderson opined that De Raffele had no restrictions as to activities of daily living and maintaining social functioning. *Id.* at 68. Dr. Anderson also found that De Raffele had "mild" difficulties with maintaining concentration, persistence or pace, and that she had no repeated episodes of decompensation. *Id.* Dr. Anderson concluded that De Raffele's claims of "depression and anxiety" were "partially credible." *Id.* Dr. Anderson also concluded that De Raffele had "no thought disorder," and that her impairment did "not appear to be significant enough to interfere with her ability to function on a daily basis." *Id.*

With regard to De Raffele's residual functional capacity ("RFC"), Dr. Liranzo opined that De Raffele had exertional limitations pursuant to which she could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk for "[a]bout 6 hours in an 8-hour workday," and that her ability to push and pull was "unlimited." *Id.* at 69. Dr. Liranzo opined that De Raffele's physical examinations showed she was "in no acute distress," and her prognosis was "stable"

14

with "no significant limitations noted." *Id.* Due to De Raffele's history of vertigo, Dr. Liranzo stated that she "should avoid all hazardous work environments including heights and machinery." *Id.* at 70.

### 3. ALJ Hearing

#### a. De Raffele's Testimony

At the hearing on January 21, 2016, De Raffele testified that she used to work as waitress prior to May 2012. *Id.* at 51. After she became sick with vertigo and mononucleosis, she stopped working because she could not bend over a table or lift. *Id.* De Raffele claimed that her "flareups" were frequent between 2012 and 2014. *Id.* at 44-45. She got little sleep at night, and she claimed that she was occasionally "bedridden," at times for as long as two months. *Id.* at 45, 52. De Raffele testified that she informed her physicians of her staying in bed for long periods of time. *Id.* at 45. De Raffele further claimed that she had daily, chronic vertigo, making her unable to exert herself. *Id.* She initially went to therapy, but could no longer afford it when her insurance coverage lapsed. *Id.* De Raffele then went to see Dr. Kates, who "adjust[ed] the crystals" to treat her condition. *Id.* This treatment did not solve the issue and she returned to Dr. Kates at a later date. *Id.*

De Raffele also testified that headaches "[v]ery often" accompanied her vertigo. *Id.* at 46. However, she had not been to an emergency room for headaches. *Id.* De Raffele took Advil and Tylenol. *Id.* De Raffele stated that these medicines were insufficient but that she could not take stronger medications because she was allergic to them. *Id.* De Raffele also claimed that she had "horrible" fibromyalgia,

diagnosed when she was 20 years old and worsening ever since. *Id.* She visited a rheumatologist three or four years before, who prescribed medications like Lyrica. *Id.* She then took Advil for joint pain as well. *Id.* De Raffele testified to suffering from chronic fatigue due to symptoms of hypothyroidism and EBV. *Id.* at 48. De Raffele explained that she did not go to a hospital because the physicians there would not be able to do much more even if she were hospitalized. *Id.* at 47. She also took Synthroid, but she denied experiencing any side effect from the medication. *Id.* at 48-49.

De Raffele testified that any of the following conditions could cause her to experience a "flareup": turning her head, looking at someone, overexerting, and too much motion, noise, or light. *Id.* at 50. Most days she could not watch TV, and using a computer was also "too much motion" for her. *Id.* When she got a "flareup of vertigo," she would feel spinning, nauseous, and headache. *Id.* De Raffele claimed that she had to lie in a quiet room with no light. *Id.* She did not take vertigo medication very often because it did not eradicate the symptoms. *Id.* at 51.

De Raffele testified that the only prescription medication she took was Synthroid, which tended to make her "a little anxious," although she stated that her anxiety could have been caused by feeling "extra weak" rather than by any medication. *Id.* at 49. She added that she did not take vertigo medication often because it made her "heart race" and also made her "feel very strange." *Id.* She also testified to having "horrible reactions" to the medication Lyrica, and that she would take generic drugs instead. *Id.* at 46. De Raffele did not believe that she

suffered from any side effect, such as anxiety and depression, from her medications.
*Id.* at 49. She had not received any psychological treatment. *Id.* at 44.

### b. Vocational Expert's Testimony

Following De Raffele's testimony, the ALJ heard from Linda Stein, a
vocational expert. *Id.* at 54-60. The ALJ asked Stein to consider a person with the
same age, education, and work experience as De Raffele, and who also had
"problems being around dust and pollen and things of that nature." *Id.* at 54-55.
The ALJ then asked Stein to assume an RFC of:

> able to do the full range of light work, except that
> [claimant] would be limited to occasional climbing ramps
> and stairs, but without climbing ladders, ropes, or
> scaffolds. She should not balance, . . with up to
> occasionally stooping, kneeling, crouching, or crawling,
> without any exposure to unprotected heights or hazardous
> machinery, and she should avoid atmospheric conditions.

*Id.* at 55. Stein testified that certain activities, such as climbing down, sitting, and
stooping, were not listed among the characteristics of De Raffele's past occupation
as a waitress. *Id.* at 55. The ALJ then asked Stein to consider the same
restrictions, except as applied to a "full range" of sedentary, unskilled work. *Id.* at
56. Stein responded that such work would be available in the national economy,
and provided three examples: telephone order clerk for room service, charge account
clerk, and addresser of envelopes. *Id.* The ALJ then asked Stein to assume an RFC
that requires being off-task for 20% of the work period, in addition to regularly
scheduled breaks of 15 minutes in the morning, 15 minutes in the afternoon, and a

mid-day break of 30 minutes to one hour.  *Id.* at 56-57.  Stein testified that there would be no jobs for a claimant with such an RFC.  *Id.* at 57.

## II.  DISCUSSION

### A.  Standard of Review

#### 1.  Judicial Review of Commissioner's Determination

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides."  42 U.S.C. § 405(g).  The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence.  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).  On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming,

modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing."  42 U.S.C. § 405(g).

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012).  The reviewing court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted).  In other words, "once an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'"  *Brault*, 683 F.3d at 448 (emphasis omitted) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

### 2.    Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).  Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

### a.    Five-Step Inquiry

The Commissioner's determination of disability follows a sequential, five-step inquiry. *Cichocki v. Astrue*, 729 F.3d 172, 173 n.1 (2d Cir. 2013); 20 C.F.R. § 404.1520. First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i).[2] If the claimant is unemployed, at the second step the Commissioner determines whether the claimant has a

---

[2] In 2017, new SSA regulations came into effect. The newest regulations apply only to claims filed with the SSA on or after March 27, 2017. Accordingly, because De Raffele's claims were filed in 2014, the Court applies the regulations that were in effect when De Raffele's claims were filed. *See, e.g.*, *Rousey v. Comm'r of Soc. Sec.*, No. 16-CV-9500 (HBP), 2018 WL 377364, at *8 n.8 & *12 n.10 (S.D.N.Y. Jan. 11, 2018) (noting 2017 amendments to regulations but reviewing ALJ's decision under prior versions); *O'Connor v. Berryhill*, No. 14-CV-1101 (AVC), 2017 WL 4387366, at *17 n.38 (D. Conn. Sept. 29, 2017) (same); *Luciano-Norman v. Comm'r of Soc. Sec.*, No. 16-CV-1455 (GTS)(WBC), 2017 WL 4861491, at *3 n.2 (N.D.N.Y. Sept. 11, 2017) (same), *adopted by*, 2017 WL 4857580 (N.D.N.Y. Oct. 25, 2017); *Barca v. Comm'r of Soc. Sec.*, No. 16-CV-187, 2017 WL 3396416, at *8 n.5 (D. Vt. Aug. 8, 2017) (same).

"severe" impairment restricting his ability to work.  20 C.F.R. § 404.1520(a)(4)(ii).

If the claimant has such an impairment, the Commissioner moves to the third step

and considers whether the medical severity of the impairment "meets or equals" a

listing in Appendix 1 of Subpart P of the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).

If so, the claimant is considered disabled. *Id.*; 20 C.F.R. § 404.1520(d).  If not, the

Commissioner continues to the fourth step and determines whether the claimant

has the residual functional capacity (RFC) to perform his or her past relevant work.

20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the claimant does not have the RFC to

perform past relevant work, the Commissioner completes the fifth step and

ascertains whether the claimant possesses the ability to perform any other work.

20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps.  *Burgess v. Astrue*, 537

F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden shifts to the

Commissioner at the fifth and final step, where the Commissioner must establish

that the claimant has the ability to perform some work in the national economy.

*See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims*

*v. Apfel,* 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ,

unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop

the record in light of the essentially non-adversarial nature of a benefits

proceeding." *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation

marks omitted).  As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits."  *Sims*, 530 U.S. at 111.  Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history.  *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. §§ 404.1512(d)–(f)).  This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity."  *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question.  Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)).  The ALJ must develop the record even where the claimant has legal counsel.  *See, e.g.*, *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).

Remand is appropriate where this duty is not discharged. *See, e.g., Moran,* 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c.  Treating Physician Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(c), 416.927(d)) (internal quotation marks omitted). A treating physician's opinion is given controlling weight, provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2).

A treating physician's opinion is not always controlling. For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner. *Guzman v. Astrue*, No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."). Additionally, where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded controlling weight." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician if clinical findings are inadequate). As a result, "the 'treating physician rule' is inextricably linked to a broader duty to develop the record. Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant

treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination." *Lacava v. Astrue*, No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust."), *adopted by*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry, the ALJ must consider several factors outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); *see* 20 C.F.R. § 404.1527(c)(2). If, based on these considerations, the ALJ declines to give controlling weight to the treating physician's opinion, the ALJ must nonetheless "comprehensively set forth reasons for the weight" ultimately assigned to the treating source. *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133 (responsibility of determining weight to be afforded does not "exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited") (referring to *Schaal*, 134 F.3d at 505 and 20 C.F.R. § 404.1527(d)(2)). The regulations require that the SSA "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted). Indeed, "[c]ourts have

not hesitate[d] to remand [cases] when the Commissioner has not provided good reasons." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran,* 362 F.3d at 33) (second and third alteration in original) (internal quotation marks omitted).

### d. Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints.'" *Id.* (quoting *Aponte v. Sec'y of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). Accordingly, the ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether the claimant suffers from a "medically determinable

impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)). Among the kinds of evidence that the ALJ must consider (in addition to objective medical evidence) are: (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *Pena*, 2008 WL 5111317, at *11 (citing SSR 96–7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

## B. The ALJ's Decision

On February 10, 2016, the ALJ issued a decision denying De Raffele's DIB application. As an initial matter, the ALJ determined that De Raffele remained insured through September 30, 2014 based on a review of her employment records. *Id.* at 20, 22. Then, at step one of the disability analysis, the ALJ found that De

Raffele had not participated in substantial gainful activity since the alleged onset date of May 5, 2012. *Id.* at 22. At step two, the ALJ found that De Raffele had the following severe impairments: fibromyalgia, chronic fatigue syndrome, migraine headaches, vertigo, and Epstein-Barr syndrome. *Id.* The ALJ deemed the hypothyroidism, allergic rhinitis, and anxiety disorder alleged by De Raffele to be non-severe. *Id.* at 22-24. At step three, the ALJ found no impairment or combination of impairments meeting or equaling the severity of the impairments in the listings in Appendix 1 of Subpart P of the regulations. *Id.* at 24.

The ALJ next turned to De Raffele's RFC at step four. The ALJ concluded that De Raffele had the RFC to:

> perform sedentary work . . . except she may not engage in work that requires more than occasional balancing, stooping, kneeling, crouching, crawling. She is precluded from work that requires climbing ropes ladders and scaffolds. [De Raffele] cannot be exposed to atmospheric conditions, unprotected heights or hazardous machinery.

*Id.* at 24. To support this finding, the ALJ followed the two-step process for evaluating a claimant's pain symptoms. At the first step, the ALJ determined that De Raffele's impairments could reasonably be expected to cause her alleged symptoms. *Id.* at 25. At the second step, the ALJ determined that De Raffele's claims about the intensity, persistence, or functionally limiting effects of her pain or other symptoms were not substantiated by the objective medical evidence. *Id.* at 25.

The ALJ also found that De Raffele's claims about the severity of her impairments were not "credible to the disabling degree alleged." *Id.* at 26.[3]

Turning to the medical opinion evidence, the ALJ granted "some weight" to Dr. Kaci's opinion that De Raffele was precluded from work that required "heavy" or "marked" physical exertion, as the terms "marked" and "heavy" were not defined and in any event would not preclude sedentary work. *Id.* at 27. The ALJ granted "great weight" to Dr. Gittelman's opinion and found that it was supported by his treatment notes showing a record of conservative treatment and "largely intact clinical examinations." *Id.* The ALJ gave "great weight" also to Dr. Anderson's opinion that De Raffele's mental impairment was non-severe. *Id.* at 28. Although Dr. Anderson was a non-examining source, the ALJ found that Dr. Anderson is a mental health specialist who "has an understanding of social security disability programs and evidentiary requirements," and that his opinion regarding De Raffele's functional limitations was supported by objective medical evidence. *Id.*[4] Finally, the ALJ gave "great weight" to Dr. Antiaris's opinion, which was

---

[3] In assessing De Raffele's credibility, the ALJ observed, among other things, that De Raffele's doctors had "not directed her to refrain from driving, and in fact she does drive on occasion" despite her testimony of "extreme and unpredictable vertigo"; that despite De Raffele's claims regarding a lack of activities of daily living and of being "confined to bed for several months at a time," her doctors' treating notes did not reflect such lack of activity or "any atrophy or loss of strength" caused by such lack of activity; that, according to the treatment notes, De Raffele in fact stayed physically active; and that she only received "conservative treatment" for her ailments. *Id.* at 26-27.

[4] The ALJ's statement that Dr. Anderson provided an opinion as to De Raffele's functional limitations is a mistake. That particular opinion was provided by Dr. Liranzo, not Dr. Anderson. *See* AR at 69-70.

"consistent with the mental status examinations in the record performed by other doctors." *Id.* However, the ALJ accorded "little weight" to Dr. Antiaris's finding that De Raffele had a "moderate" limitation for stress, as the "term 'stress' is ill defined, and often relates to factors wholly unrelated to work related tasks." *Id.*

After determining De Raffele's RFC, the ALJ found that De Raffele was unable to perform the physical demands of her past relevant work through the date last insured (*i.e.*, September 30, 2014). *Id.* at 28. Finally, at step five, the ALJ found that De Raffele's RFC would permit her to perform other jobs available in significant numbers in the national economy, given her education and past experience, including sedentary work such as telephone order clerk, charge account clerk, and envelope addresser. *Id.* at 28-29. Thus, the ALJ concluded that De Raffele was not disabled within the meaning of the Social Security Act. *Id.* at 30.

## C. Analysis

"'When the plaintiff proceeds *pro se*, as in this case, a court is obliged to construe [her] pleadings liberally' and interpret them as raising the strongest arguments they suggest." *Wellington v. Astrue*, No. 12-CV-3523 (KBF), 2013 WL 1944472, at *2 (S.D.N.Y. May 9, 2013) (quoting *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir. 2004)). Here, De Raffele's form complaint does not identify any specific legal or factual error committed by the ALJ. Compl. ¶ 9. In her opposition to the Commissioner's motion, however, De Raffele describes the impact her impairments have had on her day-to-day life and asserts that the evidence she submitted established that she is "completely unable to hold down any kind of job."

Pl. Opp. at 3; *see also id.* at 4 (arguing that, due to her medical conditions, De Raffele is "not nearly well enough to work"). The Court liberally construes this assertion as challenging the ALJ's finding at step four of the disability analysis that De Raffele retained the RFC to perform sedentary work.

Upon review of the record, the Court concludes that the ALJ failed to adequately develop the record because he did not obtain medical opinions from De Raffele's treating physicians, which in turn calls into question the ALJ's finding that De Raffele retained the RFC to perform sedentary work. Therefore, the Court remands this case to the Commissioner for further proceedings consistent with this Opinion and Order.[5]

### 1.  The ALJ Did Not Adequately Develop the Record

In general, an administrative record is adequate when it contains information addressing the disabilities and symptoms alleged by the claimant. *Schaal*, 134 F.3d at 505. Here, the ALJ obtained objective medical records about De Raffele's alleged physical ailments—including her claims of vertigo, fibromyalgia, and chronic fatigue syndrome—as well as her anxiety disorder. Furthermore, the

---

[5] The Court notes that the ALJ also erred at step three of the disability analysis by failing to consider whether De Raffele's vertigo met or equaled the listing for a disturbance of labyrinthine-vestibular function. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 2.07. Listing 2.07 requires, among other things, evidence of "[h]earing loss established by audiometry." *Id.* However, as the Commissioner correctly observes, the results of De Raffele's audiometry examinations were consistently normal. Def. Mem. at 16 n.7; *see* AR at 242, 248-51, 265-66, 362-65, 447. Because substantial evidence supports the conclusion that De Raffele's vertigo did not meet or equal Listing 2.07, the ALJ's failure to discuss this listing in his decision does not provide a ground for remand.

evidence in the administrative record reflects both De Raffele's subjective complaints to the physicians as well as their diagnoses and treatments. *See generally* AR at 288-90, 311-16, 344-67, 460-62, 474-534.

Nonetheless, the ALJ failed to adequately develop the record because he did not obtain medical opinions from Dr. Kates and Dr. Laiz, who, among De Raffele's doctors, treated her for by far the longest period of time, including through the date last insured. Indeed, the ALJ does not even mention either doctor in his decision. According to De Raffele's Disability Report dated April 18, 2014, she had been under Dr. Kates's care for at least 15 years. *Id.* at 175. Likewise, she had been under Dr. Laiz's care for at least 15 years. *Id.* at 176. Dr. Kates, in particular, repeatedly diagnosed De Raffele with vertigo, *id.* at 347, 359, 499, which is the condition she claimed most impaired her both during the hearing before the ALJ as well as in her complaint to this Court. *Id.* at 45, 50-51; Compl. ¶ 4. In fact, in discussing the relevant medical evidence in the record, the Commissioner's memorandum of law in support of her motion makes frequent and extensive references to Dr. Kates's treatment of De Raffele. Def. Mem. at 4–11. As such, even the Commissioner appears to tacitly acknowledge the importance of considering his assessment of De Raffele.

Moreover, while the record contains at least some treatment notes from Dr. Kates, it contains no treatment notes from Dr. Laiz, thereby depriving the ALJ (and

the Court) of his impressions and observations about De Raffele's medical condition.[6]

The other opinion evidence included in the record provide a further indication that Dr. Kates and Dr. Laiz's medical opinions should have been solicited and considered prior to the ALJ making his decision.[7] While Dr. Gittelman's records state that he first treated De Raffele on August 8, 2008, De Raffele has stated that she first visited with him only a "few years" prior to 2013, and it appears that she last visited with him in October 2013, almost a year before the date last insured (September 30, 2014). AR at 445. Dr. Maloney had seen De Raffele on only two occasions in December 2013. *Id.* at 456-62. The consultative examiners, Dr. Antiaris and Dr. Kaci, each saw De Raffele only for a single medical visit. *Id.* at 464-73. Dr. Anderson and Dr. Liranzo did not meet De Raffele at all, and instead provided their opinions based on a review of medical evidence in the record. *Id.* at 63-72. None of these doctors could have provided an opinion containing the same

---

[6] In her memorandum of law, the Commissioner refers to certain treatment notes that she attributes to Dr. Laiz. However, these particular treatment notes were provided by other physicians, not Dr. Laiz. *See* Def. Mem. at 5-7 (attributing to Dr. Laiz treatment notes that were actually prepared by Dr. Scott Newman, AR at 426-44, Dr. Leonard Dire, *id.* at 308-10, and Dr. Vartanian, *id.* at 311-13).

[7] The Court notes that in the Disability Determination Explanation completed by Dr. Anderson and Dr. Liranzo, there is a table indicating that "EF" materials (apparently referring to "Electronic Filings") were requested from Dr. Kates and Dr. Laiz on May 1, 2014. AR at 66-67. It is unclear whether this "EF" request may have included a request for Dr. Kates and Dr. Laiz's medical opinions.

"detailed, longitudinal picture of [De Raffele's] medical impairment(s)" as Dr. Kates

and Dr. Laiz. 20 C.F.R. § 404.1527(c)(2).[8]

The ALJ's failure to obtain medical opinions from Dr. Kates and Dr. Laiz, as

well as treatment notes from Dr. Laiz, is reversible error. *See, e.g.*, *Downes v.*

*Colvin*, No. 14-CV-7147 (JLC), 2015 WL 4481088, *12 (S.D.N.Y. July 22, 2015)

(remand ordered where ALJ failed to develop "complete and full evidentiary record"

because ALJ "did not attempt to obtain the opinions of [claimant's] two treating

physicians . . . as to the limitations that [claimant's] pneumothorax imposed on his

work-related capabilities"). Contrary to the Commissioner's argument otherwise

(Def. Mem. at 16), the fact that De Raffele was represented by an attorney at the

January 21, 2016 hearing is of no consequence, as the ALJ's imperative to develop

the record "remains in force even where the claimant is represented by counsel."

*Johnson v. Colvin*, No. 14-CV-2334 (CM) (JLC), 2015 WL 400623, at *7 (S.D.N.Y.

Jan. 30, 2015) (citing *Perez*, 77 F.3d at 46), *adopted by*, 2015 WL 3972378 (S.D.N.Y.

June 1, 2015).

---

[8] De Raffele's Disability Report lists two other medical providers from whom no information has been obtained: Freda Chau, who treated De Raffele for mononucleosis and EPV, and Elizabeth Kunreuther, who treated her for hypothyroidism. AR at 173, 175-76. However, as these providers treated De Raffele only for short periods of time, the Court cannot conclude based on the record that the ALJ should have obtained any information from them as well.

## 2. The Record was Not Sufficiently Comprehensive to Permit the ALJ to Make an RFC Determination at Step Four

Because the record has not been adequately developed due to the absence of medical opinions from Dr. Kates and Dr. Laiz concerning De Raffele's ability to perform work-related activities through the date last insured, this case must be remanded to give the ALJ an opportunity to reassess De Raffele's RFC after obtaining opinions from her treating physicians.

### a. Role of Treating Physician's Opinion in the RFC Determination

The RFC determination is an adjudicator's finding of "the most [a claimant] can still do [in a work setting] despite [her] limitations." 20 C.F.R. § 404.1545(a); *see also* SSR 96-5p, 1996 WL 374183 (July 2, 1996). An ALJ considers medical source statements and all other evidence in the case record in making an RFC finding. SSR 96-5p, 1996 WL 374183 (July 2, 1996). A medical source statement is an evaluation from a treating physician or consultative examiner of "what an individual can still do despite a severe impairment, in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis." *Id.* It is an ALJ's responsibility to "develop [the claimant's] complete medical history, including arranging for a consultative examination if necessary, and mak[e] every reasonable effort to help [the claimant] get medical reports from [her] own medical sources." 20 C.F.R. § 404.1545(a)(3) (citing 20 C.F.R. § 404.1512(d–f)). "In light of the special evidentiary weight given to the opinion of the treating physician . . . the ALJ must 'make every reasonable effort to

obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of the treating physician as to the existence, the nature, and the severity of the claimed disability.'" *Molina v. Barnhart*, No. 04-CV-3201 (GEL), 2005 WL 2035959, at *6 (S.D.N.Y. Aug. 17, 2005) (quoting *Peed v. Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991)).

Nevertheless, "[t]he Second Circuit has held that an ALJ's failure to obtain a medical source statement from a treating physician before making a disability determination is not necessarily an error requiring remand." *Hooper v. Colvin*, 199 F. Supp. 3d 796, 814 (S.D.N.Y. 2016) (citing *Tankisi v. Comm'r of Social Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013)). "The inquiry into the need for a treating physician's opinion hinges on the 'circumstances of the particular case, the comprehensiveness of the administrative record,' and 'whether . . . [the record,] although lacking the opinion of [the] treating physician, was sufficiently comprehensive to permit an informed finding by the ALJ.'" *Id.* (quoting *Sanchez v. Colvin*, No. 13-CV-6303, 2015 WL 736102, at *5–6 (S.D.N.Y. Feb. 20, 2015)).

### b. The ALJ Should Request Opinions from De Raffele's Treating Physicians and Reassess the RFC Determination

Although the ALJ thoroughly analyzed the objective medical evidence contained in the record as well as De Raffele's subjective complaints and credibility, the ALJ's determination that De Raffele retained an RFC to perform sedentary work was ultimately based on insufficient evidence in light of the absence of an opinion from at least one of De Raffele's treating physicians, Dr. Kates or Dr. Laiz.

36

In particular, the medical opinions relied upon by the ALJ provided an insufficient record upon which to assess De Raffele's RFC at step four of the disability analysis. Of the doctors whose opinions were cited in the ALJ's decision, only Dr. Gittelman may have qualified as a treating physician. As a treating physician, Dr. Gittelman's opinion could have been accorded controlling weight if it was not inconsistent with the other substantial evidence in the case. 20 C.F.R. § 404.1527(c)(2). The ALJ, however, was unclear about whether he considered Dr. Gittelman to be a treating physician. Even though Dr. Gittelman was referred to as a "treating source" in the ALJ's decision (AR at 27), the ALJ did not give controlling weight to Dr. Gittelman's opinion nor did he consider the factors set forth by the Second Circuit for determining how much weight Dr. Gittelman's opinion should carry. *See id.* at 27-28; *Halloran*, 362 F.3d at 32.

In any event, even had Dr. Gittelman's opinion been given controlling weight, the ALJ's statement that Dr. Gittelman "did not assess any limitations" as to De Raffele's physical activities is incorrect. AR at 27. Dr. Gittelman's opinion contained a critical qualifier: that "[w]hen dizziness occurs," De Raffele's activity was "to be limited." *Id.* at 448. Dr. Gittelman did not elaborate on the extent and frequency of De Raffele's "dizziness," nor did he explain in what ways De Raffele would be "limited" if and when such dizziness occurred. *Id.* In short, his opinion was too vague to permit the ALJ to make the finding that De Raffele retained an RFC to perform sedentary work with restrictions. *Id.* at 27; *see, e.g.*, *Sanchez*, 2015 WL 736102, at *6 (reliance on consulting examiner's opinion was improper where

examiner's statements were "far from conclusive" and instead "couched in hesitant, vague, and at points equivocal terms").

Aside from Dr. Gittelman's, the other opinions in the record were furnished by doctors who had only a superficial familiarity with De Raffele and whose opinions lacked specificity and clarity. As previously noted, Dr. Maloney treated De Raffele on only two occasions and stated in his opinion that he could not provide an opinion about De Raffele's ability to do work-related activities. AR at 454.[9] Dr. Kaci and Dr. Antiaris each met De Raffele on a single occasion prior to issuing their respective opinions, and, as the ALJ observed in his decision, both of their opinions suffered from a lack of clarity on key points relating to De Raffele's RFC. *Id.* at 27 (ALJ notes that Dr. Kaci did not define key terms "marked" and "heavy" in opining that De Raffele had "marked limitation to any physical exertion"); *id.* at 28 (ALJ notes that the "term 'stress' is ill-defined" in Dr. Antiaris's opinion that De Raffele is "moderately limited in her ability to appropriately deal with stress"). Dr. Anderson and Dr. Liranzo's opinions were based on a review of the record and they did not personally examine De Raffele at all.

Based on the treatment notes in the record, Dr. Kates appears to have been the only doctor who treated De Raffele through the date last insured and was therefore the only doctor capable of opining on De Raffele's RFC for the entire period in question, *i.e.*, May 5, 2012 (the disability onset date) to September 30,

---

[9] In fact, Dr. Maloney left blank answers to most of the questions in his medical opinion form, which reinforces the conclusion that he had, at best, a superficial familiarity with De Raffele's medical condition. AR at 450-55.

2014 (the date last insured). Dr. Kates also appears to have been the only doctor who treated De Raffele after the date last insured, *see* AR at 475-500, which put him in a position to shed additional light on her medical condition and RFC. *See, e.g.*, *O'Connell v. Colvin*, 558 F. App'x 63, 64 (2d Cir. 2014) ("[E]vidence of an applicant's condition subsequent to his date last insured may be pertinent to his condition prior to that date") (citing *Lisa v. Sec'y of Dep't of Health & Human Servs.*, 940 F.2d 40, 44 (2d Cir. 1991)).

Furthermore, the opinion evidence pertaining to De Raffele's RFC played a particularly significant role in this case in view of the ALJ's finding that she suffered from fibromyalgia (AR at 22), a "disease that eludes [objective] measurement." *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003). It was incumbent upon the ALJ to obtain a sufficiently thorough opinion from at least one treating physician to assess whether De Raffele's fibromyalgia prevented her from performing sedentary work even with restrictions. *See, e.g.*, *Battaglia v. Astrue*, No. 11-CV-02045 (BMC), 2012 WL 1940851, at *8 (E.D.N.Y. May 29, 2012) (because "medical source statements would have been particularly significant in this case in light of the fact that plaintiff's primary impairment during the relevant period was fibromyalgia," ALJ's failure to request medical source statements required remand).

To be sure, the ALJ did obtain extensive medical evidence in this case, including opinion evidence, and considered a substantial amount of evidence in his decision. However, under the circumstances described above—that is, the failure to obtain opinions from De Raffele's treating physicians, as well as the lack of clarity

in the opinions that actually were obtained—there is an "obvious gap" in the record that must be filled in order for a fair and complete assessment of De Raffele's RFC to take place. *Hooper*, 199 F. Supp. 3d at 816 ("Although the record is extensive, the absence of any up-to-date medical opinion assessing [claimant's] mental functional limitations remains an 'obvious gap'" requiring remand) (quoting *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015)); *Downes*, 2015 WL 4481088, at *11 ("[U]nless 'there are no obvious gaps in the administrative record and the ALJ already possesses a complete medical history,' remand is necessary where the ALJ did not attempt to obtain opinions from the claimant's treating physicians to accompany primary source records.") (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999)); *see also Johnson*, 2015 WL 400623, at *11 (ALJ's failure to request necessary medical records "is grounds in itself for a remand").

### III.   CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied, De Raffele's cross-motion is granted, and the case is remanded to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g).  On remand, the ALJ should (1) ask Dr. Kates and Dr. Laiz to provide their opinions regarding De Raffele's ability to perform work-related activities, and (2) ask Dr. Laiz to provide his treatment notes.

The Clerk is respectfully directed to close Docket Number 13, and enter

judgment in favor of De Raffele.

**SO ORDERED.**

Dated: New York, New York
      August 6, 2018

_____
JAMES L. COTT
United States Magistrate Judge

**A copy of this Opinion and Order has been mailed to the following:**

Holly Ann De Raffele
11 LaSalle Dr.
New Rochelle, NY 10801